No. 04-0093C
Judge Horn

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JAMES R. VANDERPOOL, THOMAS L. CAVEN,
MICHELLE L. ROOT, RICHARD L. ROBERTS, THOMAS J. FUNKE,
WILLIAM E. FISHER, DONALD MCMULLEN, and ROBERT MACHO,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S 3RD SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KATHRYN A. BLEECKER
Assistant Director

STEVEN J. ABELSON
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8TH Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-0461
Fax: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:

RAYMOND A. MARTINEZ
Attorney
Federal Aviation Administration
AGC-30 Personnel and Labor Law
600 Independence Ave., S.W.
Washington, D.C. 20591

May 8, 2007

# INDEX TO 3RD SUPPLEMENTAL APPENDIX[1/]


| DOCUMENT(s) | PAGE(s) |
|---|---|
| Pertinent Portions of Memorandum, Dated September 11, 1997, FAM Premium Pay Proposal | 1 |
| Action Memorandum to the Secretary, Dated October 2, 2001 Hiring and Retirement Provisions for Federal Air Marshals | 9 |
| Pertinent Provisions of Public Law 107-71, Aviation and Transportation Security Act ("ASTA) Dated November 19, 2001 | 12 |
| Transportation Security Administration Decision Memorandum, Approved February 13, 2002 | 19 |
| Pertinent Portions of Federal Aviation Order 1650.6c, Dated April 25, 1996, Federal Air Marshal Program | 21 |


---

1/ The copy of Pub. L. 107-71 contained in this supplemental appendix was printed from Westlaw.

→ AAD

U.S. Department
of Transportation
Federal Aviation
Administration

# Memorandum

**Subject:** ACTION: FAM Premium Pay Proposal

**Date:** SEP 11 1997

**From:** Associate Administrator for Administration, AAD-1

**Reply to Attn. of:**

**To:** Administrator, AOA-1

On August 22 the Compensation Committee endorsed the attached pay proposal, which I am forwarding to you for approval.

The proposal supports premium pay for those employees of the Civil Aviation Security organization who are certified to perform Federal Air Marshal duties. FAM Premium Pay is designed to compensate this highly specialized group of employees for very unique work conditions, while also correcting problems associated with work scheduling and pay administration practices. This package is also required for Civil Aviation Security to successfully complete the program restructuring that is in progress and which is described in the attachment.

The Associate Administrator for Civil Aviation Security assures us that the personnel costs of the restructured Federal Air Marshal program, even with the proposed FAM Premium Pay, will be less than the personnel costs associated with the current program at full operational staffing.

The proposal and related details are attached. If you have any questions, please do not hesitate to contact me at extension 79105.

Edwin A. Verburg

Attachments

Approval: Jane Garvey (signature) Sept. 13, 1997 (date)

Let's Discuss: ________ (signature) ________ (date)

Attachment 1

## DECISION PAPER ON FEDERAL AIR MARSHAL PREMIUM PAY

We are proposing to implement Federal Air Marshal (FAM) Premium Pay to be paid at a rate of 15% of basic pay. FAM Pay would be paid to employees certified to perform FAM duties in accordance with FAA Order 1650.6C, Federal Air Marshal Program. It would be paid on a quarterly basis and would be in addition to traditional premium pay (overtime, Sunday pay, holiday pay, and night differential) currently provided under the FAA Personnel Management System and in accordance with the Fair Labor Standards Act.

The FAM Program has, in the past few years, experienced significant recruitment and retention problems. In July, a new program structure was approved to address these concerns. The approval of FAM Pay is vital to the successful implementation of these changes. FAM Pay is designed to address the following objectives:

- We need to recruit the future FAM force. The demands of the position and the skill requirements are so unique that we cannot limit our candidate pool to the existing ACS work force. In recruiting outside the FAA, we are competing with other Federal agencies that are providing 25% annual premium pay and special benefits for similar work.

- We need to retain people in the program who are currently trained and qualified FAM's. Attrition has already made it extremely difficult for the FAM Program to meet operational requirements. We also need experienced staff to remain with the program to provide a depth of skills and to assist in integrating new employees as we transition into the new program.

- To attract the current highly trained and skilled volunteers to the permanent program, or to retain them as volunteers while we transition to the new program, we need to off-set the negative impact of required changes in work schedule and pay administration that will reduce the overtime earned on FAM deployments.

- FAM work imposes unique and stressful requirements on employees that existing compensation mechanisms, including overtime, do not address.

The proposed system, including the changes in work schedule and overtime compensation, will simplify pay administration. The current system is subject to numerous pay errors, despite elaborate procedures for documenting time and attendance during deployments.

## BACKGROUND

**Program Restructuring:** FAM's have been an integral part of the effort to control and deter criminal acts against civil aviation for almost 40 years. From its inception in the 1960's until 1985, the FAM Program operated under the authority and control of several entities and employed personnel from various sources. FAM's were recruited from civilian law enforcement agencies, the military, and from the ranks of FAA Civil Aviation Security Inspectors. As a result of problems of coordination and control, in 1974 Congress granted the FAA exclusive responsibility to direct law enforcement efforts in the event of an act of air piracy. In 1985, Public Law 99-83 authorized the Secretary of Transportation, with the approval of the Secretary of State and the Attorney General, to designate FAM's as Federal law enforcement officers. This legislation authorized the FAM Program as it exists today.

In 1992, ACS initiated a major effort to enhance the FAM Program. At that time all Civil Aviation Security Inspectors were expected to also serve as FAM's. The qualification requirements were made significantly more rigorous, and volunteers were selected from the existing ACS field work force. The program was designed to have 66 employees: 55 part time volunteers from the ACS field organization and 11 full-time staff. The program design provided that FAM's would spend approximately 55% of their time performing FAM functions and 45% performing Civil Aviation Security Inspector work in their respective regional duty locations.

The 1992 enhancements created a FAM cadre that comprises a highly skilled and professional force. Problems of recruitment and retention, however, threatened the long-term viability of the program as designed. In December 1996, a task force was chartered within the Civil Aviation Security organization to evaluate options and to recommend changes to address these problems. In July 1997, after briefing the Department and the Office of the Administrator on this study and the recommendations, the Associate Administrator for Civil Aviation Security made the decision to staff the FAM program on a full-time basis and to locate all FAM positions in Atlantic City, New Jersey. These changes have been initiated and will be completed in 1998. A description of the new program is attached.

**Compensation Issues:** While on deployment, FAM's are compensated in accordance with guidance developed in 1987 by a national work group representing the Human Resource Management, Civil Aviation Security, and Accounting (payroll) organizations. This guidance provides that while on deployment, FAM's will remain on a regular fixed tour of duty (Monday-Friday, 8:00 to 4:30) and that all periods of time during regular duty hours which are not duty time are excused absences for purposes of pay. The total hours in pay status are increased because the majority of mission flights occur outside regular duty hours, during evenings and weekends. The work schedule, combined with the use of excused absence, significantly increases the overtime paid to FAM's while on deployment.

The DOT Office of Inspector General, in a report issued April 17, 1997, recommended that the FAA implement a work schedule such as "first 40 hours of duty" to eliminate administrative leave and reduce overtime (Report No. R9-FA-7-006). Our proposal includes using a "first 40-hour" tour of duty for the entire FAM Program, for both deployment weeks and non-deployment weeks. At the same time, we will terminate the use of excused leave during deployments. Only hours that exceed 40 for the work week will be overtime hours, and the total overtime hours will be further reduced because hours of excused absence will not be counted as hours worked. In the past, an FG-12 FAM could expect to earn an average of $1,000 per week in overtime while on deployment; these scheduling and pay administration changes are estimated to reduce that amount to an average of $375 per week.

**Unique Demands of FAM Work:** FAM work imposes unique demands on employees that cannot be recognized through existing compensation mechanisms. These include:

- Rigorous tactical skills requirements: FAM's must maintain a level of firearms expertise that is the most stringent of all Federal civilian positions authorized to use firearms. Maintaining this level of firearms expertise requires continuous, rigorous drill. FAM's also continually practice the operational application of these skills to develop the judgment and timing that are essential to proficiency.

- On-call status: In the restructured program, the permanent FAM work force will be on call 24-hours a day to cover emergency deployments.

- Physical risk: FAM's are trained to use non-lethal and lethal force to control inflight situations and are frequently deployed to countries where being an official of the US government can make them a potential target themselves.

- Health risk: FAM's are deployed to countries where they are exposed to disease; they are exposed to the risk of injury in training; and they endure significant physical discomfort (they may cross over 30 time zones in one week). The nature of the work and the training regime are inherent threats to their ability to maintain the medical certification that is a requirement of the position.

- Regular and extended periods of travel: In the restructured program, full-time FAM's will spend approximately 60% of the work year away from home.

- Intense schedule: In a deployment month, FAM's can be expected to work 190 hours; when FAM's are not on deployment, they continue to work a 40-hour week. In comparison, Part 121 flight crews work 80 hours a month and, for the most part, have little additional work hours when not flying. The average FAM mission time is 13.9 hours; in comparison, a Part 135 pilot cannot be scheduled to work more than 14 hours in a day.

## COMPENSATION PLAN

In the restructured program, individuals will be recruited into full-time FAM positions at the FG-7 through the FG-12 levels. The following compensation package is described using an FG-12 FAM as the example.

| Proposed Work Schedule and Compensation Plan | |
|---|---|
| Base Salary | $49,081 |
| Estimated Overtime, Night Differential, Sunday and Holiday Pay | 7,751 |
| 15% FAM Premium Pay | 7,362 |
| Projected Annual Compensation | $64,194 |

If the current work scheduling and pay administration practices were applied to the restructured full-time program, an FG-12 FAM would earn:

| Continued Current Work Schedule and Compensation Plan | |
|---|---|
| Base Salary | $49,081 |
| Estimated Overtime, Night Differential * | 21,745 |
| Projected Annual Compensation | $70,826 |

* Sunday and Holiday work are omitted from this computation because on a regular work schedule, they are compensated through overtime.

If changes in work scheduling and pay administration were implemented without FAM Pay, a full-time FG-12 FAM would earn an estimated $56,800 per year. Currently, part-time volunteer FG-12 FAM's earn an estimated $52,600 to $59,400 per year flying a schedule that is less intense than the full-time program will require. The variation in annual pay for current part-time FAM's reflects varying locality rates and deployment schedules. In the full-time program, the deployment schedules for individual FAM's will be very similar, and only one rate of locality pay will apply.

## COMPARABILITY

The U.S. Customs Service employs pilots and electronic surveillance technicians who perform aviation-related law enforcement-type functions. Each week, AWACS planes deploy on 3 to 4 12-hour flights over the Gulf of Mexico to perform surveillance to identify possible drug shipments. The pilots are covered under 20-year early law enforcement retirement and receive 25% annual premium pay; the grades are GS-12 to GS-13. The radar technicians are not covered by early retirement, but they do earn 25% annual premium pay; the grades are GS-11 to GS-12. These crews do not have extended time away from home and are not exposed to the physical hazard or the schedule intensity that is comparable to the FAM's.

Within FAA, AVN inspection pilots work a regular schedule, Monday through Friday. They are scheduled for approximately 29 weeks away from home (a week may include only one night in travel status). As Part 135 pilots, they cannot be scheduled to work more than 14 hours per day, and they are not on call. They earn overtime true, and the average overtime compensation is $2,000-$3,000 per year, an indicator of a lower level of schedule intensity in comparison to the FAM's. These pilots, whose grades range from FG-13 to FG-14, are also paid 5% ATRA. In summary, the intensity of schedule, physical hazard, and on- call status distinguish FAM's from this group of employees.

Within Federal law enforcement agencies, the compensation package routinely includes 25% annual premium pay and a 20-year retirement plan. Agency contribution to the early retirement plan for each employee is 24.3% of base salary; in comparison, the agency contribution to the traditional FERS retirement plan that covers the FAM's is 11.4%. FAM positions are not within the legal definition of "law enforcement officer" for purposes of retirement coverage; in addition the mandatory 4-year rotation that will apply to FAM positions in the new program would not allow employees to accumulate the covered time required for early retirement. (For a complete explanation of the FAM career path, see Attachment 3.)



OCT.-29'98(THU) 10:17 ANM-700 TEL:425 227 1700 P. 007

**BUDGET IMPACT**

The decision to establish the FAM Program as a full-time, centralized program was based on cost as well as ability to improve recruitment and retention of highly skilled FAM's. Centralizing FAM employee resources saves a substantial amount in deployment costs because "deadhead" trips are no longer required to assemble a team prior to deployment or to return team members to their permanent duty locations at the end of a deployment.

Salary costs are also saved because of a reduction in the average rate of locality pay, staffing at a range of grades below the FG-12 level, and a slight decrease in the total number of positions allocated to the program. The following compares the salary costs of the new program with the salary costs of the current program, if it were staffed at the fully operational level as originally designed:

| | **Status Quo** | **New Program with Field Transition Staff *** | **New Program without Field Transition Staff *** |
|---|---|---|---|
| Basic Salary and Benefits | $2,661,655 | $2,417,876 | $2,102,076 |
| Estimated Overtime | $ 452,130 | $ 339,574 | $ 240,892 |
| FAM Premium Pay | NA | $ 226,757 | $ 115,098 |
| **TOTAL** | **$3,113,785** | **$2,984,207** | **$2,458,066** |

* Field transition staff are current FAM's who choose to continue in the part-time, voluntary program until the new program is fully staffed and trained.

In the fourth year of the new program, as employees hired at lower grades are promoted to the FG-12 level, annual salary costs (in current year dollars) are estimated to peak at $2,843,246. In the following years, total salary costs will decrease again as FG-12 level employees rotate out to regional assignments, and new FAM's are recruited, thereby creating a greater mix of grade levels again.

The new program will incur change of station (PCS) costs every 3 to 4 years as FAM's move to their regional assignments. Even in these high expense years, however, the combined savings from travel and personnel costs would cover the

PCS costs. The estimated travel costs for a fully operational decentralized program are approximately $1,226,150 per year; these costs are estimated at $582,600 for the new program, a savings of $643,550 per year. PCS costs for year 4 are estimated at $910,000, which will be offset by the $914,000 annual savings in salary and travel costs projected for the new restructured program.

AH100 ☒007

U.S. Department of Transportation

Assistant Secretary for Administration

400 Seventh St., S.W. Washington, D.C. 20590

011003-009

CONTROL

October 2, 2001

ACTION MEMORANDUM TO THE SECRETARY

From: Melissa J. Allen, Assistant Secretary for Administration
x62332

Prepared by: Mari Barr Santangelo, Director,
Office of Human Resource Management
x64088

Re: Hiring and Retirement Provisions for Federal Air Marshals

ACTION REQUIRED

The job requirements for Federal Air Marshals are being upgraded to Law Enforcement Officer (LEO) status as part of the Nation's current critical effort to upgrade aviation security. Retirement law and regulation restrict LEO status to "young and physically vigorous individuals" because of the arduous nature of the positions. However, the Secretary has expressed an interest in maintaining maximum flexibility in the entry age for these positions. To accomplish this objective and facilitate a timely hiring process, we have revised the relevant Departmental policy language and prepared a delegation of authority from the Secretary to the Federal Aviation Administrator.

SUMMARY

*Maintaining Age Flexibility:*

As noted above, law and regulation require that LEO status be restricted to positions "the duties of which are so rigorous that employment opportunities should...be limited (through establishment of a maximum entry age and physical qualifications) to young and physically vigorous individuals..." (5 CFR 842.802) In addition to mandating a maximum entry age, the law and regulation also mandate separation from the LEO position when the officer becomes 57 years old. In rare circumstances, that can be extended to age 60.

The attached policy on maximum entry age updates the Department's current uniform entry age requirements for all of its LEO positions. LEO positions are established in FAA, USCG, OIG, and NHTSA. The Department has established 36 as the maximum

9

entry age, but there is an allowance for exceptions. The attached delegation memorandum from the Secretary to the Federal Aviation Administrator delegates to the Administrator the authority "to establish age criteria and programs for the employment of individuals who exceed the maximum entry age limits…when those individuals are being selected for Federal Air Marshal positions." This will allow the flexibility in hiring that was requested for these positions, and will also allow the Administrator to modify criteria as circumstances and needs change.

Three points are important: (1) Because of the law's mandatory separation provision cited above, individuals hired after the age of 40 will not complete the necessary 20 years to qualify for retirement under LEO provisions. The FAA will need to communicate this clearly to candidates. (2) As we interpret the law, the mandatory separation is from the LEO position, and not necessarily from Federal service. The Federal Aviation Administration would retain the discretion to assign the employee to any other position for which she/he is qualified. (3) The FAA has decided to provide a 25 percent annual premium pay to the Federal Air Marshals. Because the FAA is setting pay under its independent personnel authority, and not under Title 5, there is currently no statutory authority to treat this additional pay as base pay for retirement computation purposes. (The FAA is covered under Title 5 retirement rules, which address specific forms of premium pay as base pay.) It is important that the FAA make this clear, particularly to candidates who are current LEOs under Title 5 provisions that do treat the additional pay as base pay.

*Facilitating Timely Hiring:*

The law states that the LEO will be separated before the age of 57 unless an exemption has been granted by the Secretary. We asked the Office of Personnel Management to find that the Secretary may delegate his authority for exemption to the Federal Aviation Administrator, and to further clarify that exemptions may be granted to a category of employees, rather than exclusively on a case-by-case basis. They granted that request, as reflected in the attached letter. This will greatly facilitate the timely hiring of the large numbers of Marshals the FAA hopes to appoint.

BACKGROUND

The events of September 11, 2001 have caused a rethinking of the Department's approach to Federal Air Marshal positions. Because they have not been considered LEOs in the past, these efforts have been necessary to clarify what the change in status will mean. On September 19 of this year, in response to a request from the FAA dated the same day, I approved coverage of Federal Air Marshals as LEOs.

Attachments

- Policy on maximum entry age for law enforcement officers

10

- Delegation memorandum from the Secretary to the Federal Aviation Administrator
- Policy clarification letter from the U.S. Office of Personnel Management

RECOMMENDATIONS

- Approve the revised uniform entry age requirements for all DOT LEO positions.
- Sign the attached delegation memorandum to the Federal Aviation Administrator.
- The Office of the Assistant Secretary for Administration and the Office of General Counsel will work together to draft statutory language that will provide authority to treat the 25 percent premium pay as base pay for retirement computation purposes.

The Secretary

APPROVED: [signature]

DISAPPROVED: ______

COMMENTS: ______

DATE: 10-19-01

**UNITED STATES PUBLIC LAWS**
**107th Congress - First Session**
**Convening January, 2001**

Copr. © West Group 2001. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 107-71 (S 1447)
November 19, 2001
AVIATION AND TRANSPORTATION SECURITY ACT

An Act To improve aviation security, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 49 USCA § 40101 NOTE >>

SECTION 1. SHORT TITLE.

This Act may be cited as the "Aviation and Transportation Security Act"

TITLE I--AVIATION SECURITY

SEC. 101. TRANSPORTATION SECURITY ADMINISTRATION.

<< 49 USCA § 114 >>

Copr. © West 2007 No Claim to Orig. Govt. Works

(a) IN GENERAL.--Chapter 1 of title 49, United States Code, is amended by adding at the end the following:

"§ 114. Transportation Security Administration

"(a) IN GENERAL.--The Transportation Security Administration shall be an administration of the Department of Transportation.

"(b) UNDER SECRETARY.--

"(1) APPOINTMENT.--The head of the Administration shall be the Under Secretary of Transportation for Security. The Under Secretary shall be appointed by the President, by and with the advice and consent of the Senate.

"(2) QUALIFICATIONS.--The Under Secretary must--

"(A) be a citizen of the United States; and

"(B) have experience in a field directly related to transportation or security.

"(3) TERM.--The term of office of an individual appointed as the Under Secretary shall be 5 years.

"(c) LIMITATION ON OWNERSHIP OF STOCKS AND BONDS.--The Under Secretary may not own stock in or bonds of a transportation or security enterprise or an enterprise that makes equipment that could be used for security purposes.

"(d) FUNCTIONS.--The Under Secretary shall be responsible for security in all modes of transportation, including--

"(1) carrying out chapter 449, relating to civil aviation security, and related research and development activities; and

"(2) security responsibilities over other modes of transportation that are exercised by the Department of Transportation.

"(e) SCREENING OPERATIONS.--The Under Secretary shall--

Copr. © West 2007 No Claim to Orig. Govt. Works

opportunity for comment and without prior approval of the Secretary.

"(B) REVIEW BY TRANSPORTATION SECURITY OVERSIGHT BOARD.--Any regulation or security directive issued under this paragraph shall be subject to review by the Transportation Security Oversight Board established under section 115. Any regulation or security directive issued under this paragraph shall remain effective unless disapproved by the Board or rescinded by the Under Secretary.

"(3) FACTORS TO CONSIDER.--In determining whether to issue, rescind, or revise a regulation under this section, the Under Secretary shall consider, as a factor in the final determination, whether the costs of the regulation are excessive in relation to the enhancement of security the regulation will ***601** provide. The Under Secretary may waive requirements for an analysis that estimates the number of lives that will be saved by the regulation and the monetary value of such lives if the Under Secretary determines that it is not feasible to make such an estimate.

"(4) AIRWORTHINESS OBJECTIONS BY FAA.--

"(A) IN GENERAL.--The Under Secretary shall not take an aviation security action under this title if the Administrator of the Federal Aviation Administration notifies the Under Secretary that the action could adversely affect the airworthiness of an aircraft.

"(B) REVIEW BY SECRETARY.--Notwithstanding subparagraph (A), the Under Secretary may take such an action, after receiving a notification concerning the action from the Administrator under subparagraph (A), if the Secretary of Transportation subsequently approves the action.

"(m) PERSONNEL AND SERVICES; COOPERATION BY UNDER SECRETARY.--

"(1) AUTHORITY OF UNDER SECRETARY.--In carrying out the functions of the Administration, the Under Secretary shall have the same authority as is provided to the Administrator of the Federal Aviation Administration under subsections (l) and (m) of section 106.

"(2) AUTHORITY OF AGENCY HEADS.--The head of a Federal agency shall have the same authority to provide services, supplies, equipment, personnel, and facilities to the Under Secretary as the head has to provide services, supplies, equipment, personnel, and facilities to the Administrator of the Federal Aviation Administration under section 106(m).

"(n) PERSONNEL MANAGEMENT SYSTEM.--The personnel management system established by the Administrator of the Federal Aviation Administration under section 40122 shall apply to

Copr. © West 2007 No Claim to Orig. Govt. Works

employees of the Transportation Security Administration, or, subject to the requirements of such section, the Under Secretary may make such modifications to the personnel management system with respect to such employees as the Under Secretary considers appropriate, such as adopting aspects of other personnel systems of the Department of Transportation.

"(o) ACQUISITION MANAGEMENT SYSTEM.--The acquisition management system established by the Administrator of the Federal Aviation Administration under section 40110 shall apply to acquisitions of equipment, supplies, and materials by the Transportation Security Administration, or, subject to the requirements of such section, the Under Secretary may make such modifications to the acquisition management system with respect to such acquisitions of equipment, supplies, and materials as the Under Secretary considers appropriate, such as adopting aspects of other acquisition management systems of the Department of Transportation.

"(p) AUTHORITY OF INSPECTOR GENERAL.--The Transportation Security Administration shall be subject to the Inspector General Act of 1978 (5 U.S.C. App.) and other laws relating to the authority of the Inspector General of the Department of Transportation.

"(q) LAW ENFORCEMENT POWERS.--

"(1) IN GENERAL.--The Under Secretary may designate an employee of the Transportation Security Administration to serve as a law enforcement officer.

***602** "(2) POWERS.--While engaged in official duties of the Administration as required to fulfill the responsibilities under this section, a law enforcement officer designated under paragraph (1) may--

"(A) carry a firearm;

"(B) make an arrest without a warrant for any offense against the United States committed in the presence of the officer, or for any felony cognizable under the laws of the United States if the officer has probable cause to believe that the person to be arrested has committed or is committing the felony; and

"(C) seek and execute warrants for arrest or seizure of evidence issued under the authority of the United States upon probable cause that a violation has been committed.

"(3) GUIDELINES ON EXERCISE OF AUTHORITY.--The authority provided by this subsection shall be exercised in accordance with guidelines prescribed by the Under Secretary, in consultation

Copr. © West 2007 No Claim to Orig. Govt. Works

(C) requiring that such flight deck doors remain locked while any such aircraft is in flight except when necessary to permit access and egress by authorized persons; and

(D) prohibiting the possession of a key to any such flight deck door by any member of the flight crew who is not assigned to the flight deck; and

(2) take such other action, including modification of safety and security procedures and flight deck redesign, as may be necessary to ensure the safety and security of the aircraft.

(b) IMPLEMENTATION OF OTHER METHODS.--As soon as possible after such date of enactment, the Administrator of the Federal Aviation Administration may develop and implement methods--

(1) to use video monitors or other devices to alert pilots in the flight deck to activity in the cabin, except that the use of such monitors or devices shall be subject to nondisclosure requirements applicable to cockpit video recordings under section 1114(c);

(2) to ensure continuous operation of an aircraft transponder in the event of an emergency; and

(3) to revise the procedures by which cabin crews of aircraft can notify flight deck crews of security breaches and other emergencies, including providing for the installation of switches or other devices or methods in an aircraft cabin to enable flight crews to discreetly notify the pilots in the case of a security breach occurring in the cabin.

(c) COMMUTER AIRCRAFT.--The Administrator shall investigate means of securing the flight deck of scheduled passenger aircraft operating in air transportation or intrastate air transportation that do not have a rigid fixed door with a lock between the passenger compartment and the flight deck and issue such an order as the Administrator deems appropriate to ensure the inaccessibility, to the greatest extent feasible, of the flight deck while the aircraft is so operating, taking into consideration such aircraft operating in regions where there is minimal threat to aviation security or national security.

SEC. 105. DEPLOYMENT OF FEDERAL AIR MARSHALS.

<< 49 USCA § 44917 >>

(a) IN GENERAL.--Subchapter I of chapter 449 of title 49, United States Code, is amended by adding at the end the following:

Copr. © West 2007 No Claim to Orig. Govt. Works

16

"§ 44917. Deployment of Federal air marshals

"(a) IN GENERAL.--The Under Secretary of Transportation for Security under the authority provided by section 44903(d)--

***607** "(1) may provide for deployment of Federal air marshals on every passenger flight of air carriers in air transportation or intrastate air transportation;

"(2) shall provide for deployment of Federal air marshals on every such flight determined by the Secretary to present high security risks;

"(3) shall provide for appropriate training, supervision, and equipment of Federal air marshals;

"(4) shall require air carriers providing flights described in paragraph (1) to provide seating for a Federal air marshal on any such flight without regard to the availability of seats on the flight and at no cost to the United States Government or the marshal;

"(5) may require air carriers to provide, on a space-available basis, to an off-duty Federal air marshal a seat on a flight to the airport nearest the marshal's home at no cost to the marshal or the United States Government if the marshal is traveling to that airport after completing his or her security duties;

"(6) may enter into agreements with Federal, State, and local agencies under which appropriately-trained law enforcement personnel from such agencies, when traveling on a flight of an air carrier, will carry a firearm and be prepared to assist Federal air marshals;

"(7) shall establish procedures to ensure that Federal air marshals are made aware of any armed or unarmed law enforcement personnel on board an aircraft; and

"(8) may appoint--

"(A) an individual who is a retired law enforcement officer;

"(B) an individual who is a retired member of the Armed Forces; and

"(C) an individual who has been furloughed from an air carrier crew position in the 1-year period beginning on September 11, 2001,

Copr. © West 2007 No Claim to Orig. Govt. Works

as a Federal air marshal, regardless of age, if the individual otherwise meets the background and fitness qualifications required for Federal air marshals.

"(b) LONG DISTANCE FLIGHTS.--In making the determination under subsection (a)(2), nonstop, long distance flights, such as those targeted on September 11, 2001, should be a priority.

"(c) INTERIM MEASURES.--Until the Under Secretary completes implementation of subsection (a), the Under Secretary may use, after consultation with and concurrence of the heads of other Federal agencies and departments, personnel from those agencies and departments, on a nonreimbursable basis, to provide air marshal service.".

<< 49 USCA prec. § 44901 >>

(b) CONFORMING AMENDMENT.--The analysis for chapter 449 of such title is amended by adding after the item relating to section 44916 the following:

"44917. Deployment of Federal air marshals.".

<< 5 USCA § 8331 >>

(c) BASIC PAY DEFINED.--Section 8331(3)(E) of title 5, United States Code, is amended to read as follows:

"(E) availability pay--

"(i) received by a criminal investigator under section 5545a of this title; or

***608** "(ii) received after September 11, 2001, by a Federal air marshal of the Department of Transportation, subject to all restrictions and earning limitations imposed on criminal investigators under section 5545a;".

SEC. 106. IMPROVED AIRPORT PERIMETER ACCESS SECURITY.

<< 49 USCA § 44903 >>

(a) IN GENERAL.--Section 44903 of title 49, United States Code, is amended by adding at the end the following:

Copr. © West 2007 No Claim to Orig. Govt. Works

**Transportation Security Administration**
**Decision Memorandum**

**Subject:** Effective Date for Assumption of Civil Aviation Security Functions by TSA

**Background:** As part of the Aviation and Transportation Security Act, the Under Secretary of Transportation for Security assumes responsibility for those functions currently in the Federal Aviation Administration (FAA), Office of Civil Aviation Security (ACS).

**Discussion:** An analysis of the aviation security functions of the FAA is ongoing, however, certain resources clearly fall under the authority of the Under Secretary of Transportation for Security. All of the Office of Civil Aviation Security, with the exception of the Office of Internal Security Programs, falls under this authority, as do the Security Equipment Integrated Product Team (SEIPT), and the Aviation Security R&D Division (AAR-500).

The financial authorities and associated issues are being finalized via an MOU to be signed between the Administrator of the FAA and the Under Secretary. The intent of this paper is to establish the effective date as of, Wednesday, February 13, 2002, for the Under Secretary to assume responsibility for directing the operations of all relevant aviation security functions (as identified above).

**Recommendation:** Approve February 13, 2002 as the effective date for the Under Secretary of Transportation for Security to assume responsibility for directing the operations of ACS and the associated civil aviation organizations identified above.

Decision: ✓ Approve ________ Disapprove

Jane F. Garvey FAA Administrator 02/13/02 Date

Decision: ✓ Approve ________ Disapprove

John W. Magaw Under Secretary 2/13/02 Date

Decision: ✓ Approve ________ Disapprove

Michael Jackson Deputy Secretary 2/13/02 Date

**Transportation Security Administration**
**Position Paper**

**Subject:** Assumption of Civil Aviation Security Functions by TSA

**Background:** As part of the Aviation and Transportation Security Act, the Under Secretary of Transportation for Security assumes responsibility for those functions currently in the Federal Aviation Administration (FAA), Office of Civil Aviation Security (ACS).

**Discussion:** An analysis of the aviation security functions of the FAA is ongoing, however, certain resources clearly fall under the authority of the Under Secretary of Transportation for Security. All of the Office of Civil Aviation Security, with the exception of the Office of Internal Security Programs, falls under this authority, as do the Security Equipment Integrated Product Team (SEIPT), and the Aviation Security R&D Division (AAR-500).

The financial authorities and associated issues are being finalized via an MOU to be signed between the Administrator of the FAA and the Under Secretary. The intent of this paper is to explain the rationale for the Under Secretary to assume responsibility for transferring intact most of the ACS in order to begin directing the operations of all relevant aviation security functions (as identified above).

The principal reasons for recommending this approach are: 1) the organizational integrity and core missions of ACS must continue through this transition to ensure operational effectiveness; dissecting the organization into parts may likely disrupt the processes and ongoing activities; 2) some of the existing functions which are easily identified will be segmented from the larger ACS organization within relatively short timeframes after the TSA assumption, e.g. intelligence functions, training, information systems, etc.; 3) benefit of transferring most of it intact allows the TSA executives to identify the interdependencies of the activities before moving those activities into the larger TSA, thereby providing for a smoother transition; 4) this approach satisfies the transfer of function entitlements for those personnel in ACS; 5) finally, this approach allows the leadership of TSA to set the expectations of performance upon ACS sooner rather than waiting a considerably longer period of time to analyze each individual function and transfer ACS in segments.

**Concurrence Recommended:** Approve this method for the Under Secretary of Transportation for Security to assume responsibility for directing the operations of ACS and the associated civil aviation organizations identified above.

# ORDER

1650.6C

FEDERAL AIR MARSHAL PROGRAM

April 25, 1996

# DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION

WARNING NOTICE: This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Associate Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

**FOR OFFICIAL USE ONLY**
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552

Distribution: A-W(CO/PA/AM/HR/GC/IA)-1; A-WX(CS/HR)-2; A-FCS-1 (MAX)

Initiated By: ACO-70

## FOREWORD

This order prescribes policies, standards, procedures, and guidelines pertaining to the Federal Air Marshal (FAM) Program which utilizes Civil Aviation Security special agents as FAM's.

The material in this order provides basic information essential to the successful accomplishment of the duties assigned to members of the FAM cadre, their supervisors, and managers. This order incorporates the applicable provisions of Title 49 U.S.C. Section 44903 and clearly defines agency policy relative to the FAM Program.

The previous edition of this order contained a significant amount of material that has become obsolete. To improve the quality of this directive, all obsolete information has been updated or deleted.

David Hinson

David R. Hinson
Administrator

**WARNING NOTICE:** This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Associate Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

**FOR OFFICIAL USE ONLY**
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552

TABLE OF CONTENTS


| | | Page No. |
|---|---|---|
| CHAPTER 1. | INTRODUCTION | 1 |
| 1. | Purpose | 1 |
| 2. | Distribution | 1 |
| 3. | Cancellation | 1 |
| 4. | Explanation of Changes | 1 |
| 5. | Applicability | 1 |
| 6. | Mission Statement | 2 |
| 7. | Reserved | 2 |
| CHAPTER 2. | FEDERAL AIR MARSHAL AUTHORITY | 7 |
| 8. | Authority | 7 |
| 9. | Jurisdiction | 7 |
| 10. | Policy | 7 |
| 11. | Rules of Engagement for FAM's | 8 |
| 12. | Use of Force | 8 |
| 13. | Reserved | 8 |
| CHAPTER 3. | RESPONSIBILTIES | 11 |
| 14. | Associate Administrator for Civil Aviation Security | 11 |
| 15. | Federal Air Surgeon | 11 |
| 16-20. | Reserved | 11 |
| CHAPTER 4. | PROGRAM ASSIGNMENT | 21 |
| 21. | Eligibility Requirements | 21 |
| 22. | Assignment to the All Volunteer FAM Force | 21 |
| 23. | Retention | 22 |
| 24. | Resignation | 22 |
| 25. | Reserved | 22 |


**WARNING NOTICE**: This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Associate Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

**FOR OFFICIAL USE ONLY**
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552

| | | Page No. |
|---|---|---|
| CHAPTER 5. | QUALIFICATION STANDARDS | 31 |
| 26. | Medical Certification | 31 |
| 27. | Physcial Fitness | 34 |
| 28. | Firearms Proficiency | 35 |
| 29. | Reserved | 35 |
| CHAPTER 6. | TRAINING | 39 |
| 30. | Master Training Plan | 39 |
| 31. | Reserved | 39 |
| CHAPTER 7. | OPERATIONS | 45 |
| 32. | FAM Standard Operating Procedures | 45 |
| 33. | Reserved | 45 |


WARNING NOTICE: This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Associate Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

FOR OFFICIAL USE ONLY
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552

## CHAPTER 1. INTRODUCTION

1. PURPOSE. This order provides the current statement of mission, authority, use of force policy, and jurisdiction for FAM's.

2. DISTRIBUTION. This order is distributed to the director level in the Office of Civil Aviation Security Operations, Office of Public Affairs, Office of Aviation Medicine, Office of Human Resource Management, Office of the Chief Counsel, Office of International Aviation; with a division level distribution in the Office of the Associate Administrator for Civil Aviation Security, regional civil aviation security divisions, regional human resource management divisions, and maximum distribution to all FAM's and their supervisors.

3. CANCELLATION. Order 1650.6B, Federal Air Marshal Program, dated May 24, 1991, is canceled.

4. EXPLANATION OF CHANGES. The FAM Program has changed significantly since issuance of Order 1650.6B, Federal Air Marshal Program. This revision:

a. Updates the organizational responsibilities.

b. Emphasizes further the deterrent value of the FAM Program.

c. Creates an all volunteer FAM force.

d. Assigns permanent FAM team leaders.

e. Implements the master training plan.

f. Expands some key performance standards.

g. Standardizes the mission deployment preparation.

5. APPLICABILITY. This order applies to all FAM's, their supervisors, and managers. Each such person is responsible for adherence to this order.

WARNING NOTICE: This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Associate Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

FOR OFFICIAL USE ONLY
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552

6. MISSION STATEMENT. The FAM's are a force of specially trained armed civil aviation security special agents capable of rapid deployment worldwide on U.S. air carriers. The FAM mission is one of strategic deterrence against criminal acts targeting civil aviation; the tactical objective is to save lives.

7. RESERVED.

WARNING NOTICE: This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Assistant Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

FOR OFFICIAL USE ONLY
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552

## CHAPTER 3. RESPONSIBILITIES

14. ASSOCIATE ADMINISTRATOR FOR CIVIL AVIATION SECURITY. The Associate Administrator for Civil Aviation Security, ACS-1, provides overall management and direction of the FAM Program involving deployments and missions, credentials, and security classification. The associate administrator:

a. Authorizes the assignments and flights for which FAM coverage is required.

b. Establishes eligibility criteria and procedures for issuance, use, accountability, recovery, replacement, and control of FAA Form 1600-24, Official Credential; FAA Form 1650-18, FAM Credential; and the issued FAM badge.

c. Determines classification and/or protective markings of all FAM-related information.

15. THE FEDERAL AIR SURGEON. The Federal Air Surgeon, AAM-1, is responsible for assuring medical support and coordination as may be required.

16.-20. RESERVED.

WARNING NOTICE: This document is a record subject to the provisions of 14 CFR 191.1 et seq. Release of information contained herein is prohibited without the express written approval of the Associate Administrator for Civil Aviation Security, Federal Aviation Administration, or his/her designee.

FOR OFFICIAL USE ONLY
PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 U.S.C. 552